IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
MYSTIC RETREAT MED SPA &        )
WEIGHT LOSS CENTER, PLLC, AND   )
MISTY SINCLAIR, M.D.,           )
                                )
              Plaintiffs,       )
                                )
         v.                     )        1:21cv00515
                                )
ASCENTIUM CAPITAL, LLC, ZELTIQ  )
AESTHETICS LLC, AND ALLERGAN    )
USA, INC.,                      )
                                )
              Defendants.       )
```

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This case returns to the court on the second motion to compel arbitration and stay proceedings by Defendants Zeltiq Aesthetics LLC ("Zeltiq") and its successor, Allergan USA, Inc. ("Allergan"). (Doc. 84.) Plaintiffs Mystic Retreat Med Spa & Weight Loss Center, PLLC ("Mystic") and Misty Sinclair, M.D. oppose the motion. (Doc. 87.) Plaintiffs also move to strike evidence submitted with Defendants' reply brief. (Doc. 90.) The court held a hearing on the motions on December 15, 2022. For the reasons set forth below, Plaintiffs' motion to strike will be denied, and because the court finds a genuine dispute of material fact whether the arbitration provision was incorporated into the parties' contract, Defendants' motion to compel arbitration will be set for resolution by a jury.

## I. BACKGROUND

As Defendants previously moved unsuccessfully to compel arbitration and stay proceedings (Doc. 73), the court relies on the factual record developed in that motion as supplemented by the current record, which demonstrates the following:

Zeltiq sold,[1] and Ascentium financed, the purchase of medical devices designed to assist with weight loss. (Doc. 7 ¶ 8.) Plaintiff Sinclair is a board-certified neurologist with a sub-specialty in sleep disorders. (Doc. 34-1 ¶ 4.) She is also a member-manager of Plaintiff Mystic, a spa and weight loss center, with her business partner, Marcia Ballard, a nurse practitioner who is a principal at Mystic. (Id. ¶¶ 2-4; Doc. 34-2 ¶¶ 2-4.)

According to Plaintiffs, in the summer of 2016, Wes Lev, Zeltiq's sales manager,[2] approached Sinclair about Zeltiq's CoolSculpting technology for weight loss, spoke with Sinclair several times, and met with her in person.[3] (Doc. 34-1 ¶¶ 6-9; Doc. 34-2 ¶¶ 6-8.) On June 19, 2016, Lev sent an email to Sinclair and Ballard at 8:14 p.m., with a copy to Jason Wise at Ascentium, regarding the purchase of Zeltiq's CoolSculpting System and

---

[1] Zeltiq was acquired by Plaintiff Allergan in 2017. (Doc. 16 ¶ 5.)

[2] Sinclair states in her affidavit that she has known Lev for "about 6 years" (Doc. 34-1 ¶ 6), but it is not clear whether this predates the events in this case.

[3] Another medical spa operator who had provided Sinclair advice had given Lev her "name and contact information." (Doc. 34-1 ¶ 8.)

services.   (Doc. 29-2.)   The email states:

> Dr. Sinclair and Dr. Ballard,
>
> Please see the attached MSA (agreements).  I have one system and 2.
>
> I am copying Jason Wise with Ascentium to give you finance options and monthly payments.
>
> I look forward to seeing you tomorrow.[4]
>
> Best,
>
> Wes

(Doc. 29-2 at 1.)   The email also includes as attachments two proposed MSA Sales Orders, each with Attachments A, B, and C. (Doc. 29-2.)  The significant difference between the two MSA Sales Orders is that one proposes the sale of one CoolSculpting System, and the other proposes the sale of two such systems.   Pertinent here, Attachment A to both is a three-page document entitled "Attachment A: Terms & Conditions of Sale" and includes, among other terms, the following:

**APPLICABLE LAW; DISPUTE RESOLUTION**

The laws of the State of California govern this agreement without regard to conflict of laws principles or any other principles that would result in the application of a different body of law. The United Nations Convention on Contracts for the International Sale of Goods is expressly excluded from this Agreement. <u>Any controversy or claim arising out of or relating to this Agreement,</u>

---

[4] The next day was June 20, though the parties did not meet until June 22.  The discrepancy, though seemingly immaterial, is not explained in the record.

3

or its breach, shall be subject to non-binding mediation
prior to binding arbitration in Alameda County,
California under the then-current Commercial Arbitration
Rules of the American Arbitration Association by one
arbitrator appointed in accordance with such Rules. The
arbitrator shall issue a written report to the parties,
detailing the basis of any arbitration award. Judgment
on the award rendered by the arbitrator may be entered
in any court having jurisdiction. Subject to the
parties' obligation to submit disputes to binding
arbitration in accordance with this paragraph, the
California state courts of Alameda County, California
(or if there is federal jurisdiction, the United States
District Court for the Northern District of California)
have exclusive jurisdiction and venue over any dispute
arising from or related to this Agreement. Customer
hereby, irrevocably, consents to the jurisdiction of
such courts, and waives any objection thereto.
Notwithstanding the foregoing, neither party shall be
precluded, at any time, from seeking injunctive relief
or other provisional relief, or submitting any decision
of an arbitrator reached in accordance with this
paragraph, in any court of law in connection with the
enforcement of this Agreement or such party's
intellectual property rights.

(Doc. 29-2 at 7 (emphasis added).)[5]

Neither Sinclair nor Ballard in either of their affidavits
denies having received and seen Lev's June 19 email.[6]   Rather,
they contend that they never saw or "knew of the terms" of the
email's attachments until November 18, 2020.  (Doc. 34-1 ¶ 16;
Doc. 34-2 ¶ 14-15.)  Thus, they contend they never intended to

---

[5] Attachment B is a list of supplies and prices; attachment C is entitled,
"Service and Warranty Terms and Conditions."  (Id. at 8-13.)

[6] Plaintiffs' reliance (Doc. 87 at 19) on the court's earlier statement
noting lack of proof that Plaintiffs "ever saw or were aware of the MSA
attachments" is misplaced, as the court's statement was based on
Defendants' failure at that time to authenticate the June 19, 2016 and
other emails, which were merely appended to a brief and not properly
authenticated.  (See Doc. 73 at 14.)

4

agree to these attachments as part of the MSA Sales Order. (Doc. 34-1 ¶ 17; Doc. 34-2 ¶ 15.)

On June 20, Wise replied to all recipients of Lev's email, attaching financing options for Plaintiffs' purchase of the CoolSculpting equipment. (Doc. 89-2 at 2 ¶ 5, 45-56.)

On June 22, 2016, Sinclair and Ballard met with Lev regarding the purchase of Zeltiq's CoolSculpting System and services. Lev presented a single-page "Master Sales Agreement Sales Order" for Mystic's purchase of the equipment and services.[7] (Doc. 29-3; Doc. 34-1 ¶ 13; Doc. 34-2 ¶ 12.) Sinclair made two handwritten changes to the MSA Sales Order; first, to change the address to the new Mystic facility in Carthage, North Carolina; and second, to note $1,000 in marketing funds that Zeltiq would provide. (Doc. 34-1 ¶ 14, Doc. 29-3.) Lev and Sinclair both initialed and dated the two changes, and Sinclair signed the document on behalf of Mystic. (Doc. 29-3.) The bottom of the document, just above Sinclair's signature, states:

> Included Terms and Attachments. The agreement between Customer and ZELTIQ Aesthetics regarding the products described above (the 'Master Sales Agreement') includes this Sales Order and the attachments (A-C) hereto which are incorporated herein in their entirety by this reference.

(Doc. 29-3.) However, attachments A, B, and C were not appended

---

[7] This is the same document as one attached to Lev's June 19, 2016 email to Sinclair and Ballard for the sale of one CoolSculpting System.

5

to the MSA Sales Order or otherwise presented at the June 22 meeting. (Doc. 34-1 ¶¶ 13-16; Doc. 34-2 ¶¶ 12-13.)

The next day, June 23, Lev sent Sinclair, Ballard, and Wise an email and attached a copy of Plaintiffs' executed, single-page MSA Sales Order.[8] (Doc. 34-1 ¶ 18; Doc. 34-2 ¶ 16.) In an affidavit, Sinclair states: "[a]fter the pendency of this litigation, I was shown an email that Mr. Lev apparently sent on June 23, 2016, the morning after the meeting when I signed the one-page physical document." (Doc. 34-1 ¶ 18.) Similarly, Ballard states that "[a]fter the pendency of this litigation, I found an email that Mr. Lev apparently sent on June 23, 2016." (Doc. 34-2 at 16.) Neither affidavit denies having received or known of the email at the time.

On June 24, Michael Ballard, apparently Plaintiff Ballard's husband, responded to Lev's June 23 email (using the same email address for Ballard to which Lev had sent his email) stating, "Look forward to our venture" and "Thanks for your help," before asking a question about the system's voltage. (Doc. 89-2 at 59.)

On July 1, Lev emailed another Zeltiq employee, with copies to Sinclair and Ballard, seeking to confirm shipment of the equipment and noting a delivery address of 75 Magnolia Avenue in Pinehurst, North Carolina. (Doc. 89-2 at 60.) Seventeen minutes

---

[8] Zeltiq formally accepted the MSA Sales Order, by signing it, on June 27, 2016. (Doc. 29-3.)

later, Sinclair emailed a response (from her iPhone), "No, please deliver to Marcia's practice 1001 Monroe St Ste D Carthage, NC 28327." (Id. at 61.)

In August 2016, Michael Ballard, responding from the same email address as before, emailed Lev from his iPhone and copied Sinclair (again using her same email address), noting that "Our Coolsculpting machine comes with a warranty" and asking Lev to "Please send to Ascentium" as the latter needed it for insurance purposes to avoid a $100-a-month premium. (Id. at 62.) Less than a minute later, Michael Ballard sent a second email to the same recipients, attaching a copy of the inquiry from Ascentium that noted that "property insurance is required under the terms of your Financing Agreement." (Id. at 63-64.)

Sometime later, a dispute arose between the parties, and Plaintiffs sought to return the system and terminate their business relationship, claiming that the system did not work as represented. (Doc. 7 ¶¶ 25-26.) Plaintiffs allege Ascentium took possession of the CoolSculpting system but wrongfully demanded the balance due under the equipment financing agreements. (Id. ¶¶ 27, 31.) On May 10, 2021, Plaintiffs sued Defendants in North Carolina state court. (Doc. 7.) Defendants timely removed the action to this court. (Doc. 1 ¶ 8.)

In January 2022, Defendants moved to stay proceedings and compel arbitration (Doc. 29), which the court denied without

7

prejudice because "Defendants [] failed to produce admissible evidence that there was an arbitration agreement." (Doc. 73 at 13.) This was due at least in part to Defendants' failure to submit a declaration or other proper basis to authenticate the proffered documents, relying instead on assertions in their briefing, which the court determined was not admissible evidence. (Doc. 73 at 13.) Defendants now move a second time to compel arbitration, having filed declarations to authenticate the relevant documents. (Docs. 84, 84-1 and 84-2.) In response, Plaintiffs move to strike Defendants' evidence, maintain that there was no agreement to arbitrate, and, at a minimum, demand a jury trial on their motion. (Doc. 87 at 1.)

## II. ANALYSIS

### A. Motion to Strike

As a preliminary matter, Plaintiffs contend that certain emails attached to the declaration of Roald John L. Bueno in support of Defendants' motion to compel arbitration are inadmissible under Federal Rule of Evidence 901 on the grounds they are not "true and correct" copies because they contain the name of "Bridget Rebillard," an administrative assistant at Defendants' law firm, on their header. (Doc. 87 at 8-9.) Defendants respond that Rebillard's name appears on the documents merely because of the process she used to convert them to electronic format in order to electronically file them on the

8

court's docket.  (Doc. 89 at 7.)  Rebillard has filed a declaration describing how and why the documents came to be in the form in which they were filed and attests that the substance of each document was not altered in any way.  (Doc. 89-1.)

In response to Plaintiffs' objection, Defendants re-uploaded the relevant emails onto the court's docket without Rebillard's name in the header and submitted them with another declaration from Bueno, who again reauthenticated them, as an attachment to their reply brief.  (Doc. 89 at 7.)  Plaintiffs now move to strike these latest attachments to Defendants' reply brief on the ground they are "entirely new Declarations and Exhibits," ignore the rules of procedure, and should not be considered.  (Doc. 90 at 5.)

It is not readily apparent that a correction of the type here falls outside this court's local rules for reply briefs, which limits discussion to "matters newly raised in the response."  L.R. 7.3(h).  Courts in this district "have consistently held that '[r]eply briefs . . . may not inject new grounds . . . [and that an] argument [that] was not contained in the main brief . . . is not before the Court.'"  Tyndall v. Maynor, 288 F.R.D. 103, 108 (M.D.N.C. 2013) (quoting Triad International Maintenance Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006)).  Thus, it is improper, under Local Rule 7.3(h), to wait until a reply brief to provide support for an unsupported argument made in a party's first motion.  See Jarvis v. Stewart, No. 1:04CV00642,

9

2005 WL 3088589, at *1 (M.D.N.C. Nov. 17, 2005). The rule "exists to give the replying party a chance to rebut newly raised arguments, not to give the replying party an unfair advantage in having a chance to make new arguments that should have been raised initially." Pouncey v. Guilford County, No. 1:18CV1022, 2020 WL 1274264, at *5 (M.D.N.C. Mar. 17, 2020).

Here, Defendants did not offer new or additional evidence, as Plaintiffs charge. (Doc. 90 at 3.) Rather, they technically offered less, as they eliminated the header information to which Plaintiffs objected. Even if the evidence Defendants submitted with their motion to compel were inadmissible for the simple reason that the copies of emails contain information relating to counsel's administrative assistant who downloaded them to the court's docket, the court clearly has the discretion to permit such a deficiency to be corrected. Cf. A Helping Hand, LLC v. Baltimore County, MD, 515 F.3d 356, 369 (4th Cir. 2008) (noting court's discretion to consider arguments raised for first time in reply briefing); DiPaulo v. Potter, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010) (noting court's authority to permit a surreply based on new arguments when fairness dictates, citing cases). Defendants' re-filed attachments to their reply brief merely correct this single alleged deficiency and are otherwise identical to those filed with the motion to compel arbitration. Moreover, the declarations and exhibits were re-submitted solely in response to technical

10

objections attributable to this court's electronic filing system. Fairness dictates that the court allow them to be considered, and they are admissible under Federal Rule of Evidence 901. Plaintiffs' motion to strike (Doc. 90) will accordingly be denied.

## B. Motion to Compel Arbitration

### 1. Legal Standard

The Federal Arbitration Act ("FAA") establishes "a liberal federal policy favoring arbitration" agreements. <u>Moses H. Cone Memorial Hospital v. Mercury Construction Corp.</u>, 460 U.S. 1, 24 (1983). "When parties have entered into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA requires federal courts to stay judicial proceedings, and compel arbitration." <u>Murray v. United Food & Commercial Workers International Union</u>, 289 F. 3d 297, 301 (4th Cir. 2002) (citations omitted); 9 U.S.C. §§ 3-4. However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." <u>American Bankers Insurance Group v. Long</u>, 453 F.3d 623, 626-27 (4th Cir. 2006) (citation omitted). As such, the court must determine whether parties have a valid and enforceable agreement to arbitrate.[9] <u>Berkeley County School District v. Hub</u>

---

[9] Defendants contend that an "arbitrator, not the court, must determine whether Plaintiffs' claims are subject to arbitration under the MSA [Sales Order] and enforceability of the MSA [Sales Order]." (Doc. 85 at 7.) While an arbitrator may ultimately determine the scope of an

11

International Limited, 944 F.3d 225, 234 (4th Cir. 2019).

The party seeking to compel arbitration must establish an agreement to arbitrate. See In re Mercury Construction Corp., 656 F.2d 933, 939 (4th Cir. 1981), aff'd sub nom. Moses H. Cone, 460 U.S. 1 (1983); see Adkins v. Labor Ready, Inc., 303 F.3d 496, 500-01 (4th Cir. 2002) (requiring litigant seeking to compel arbitration to demonstrate "a written agreement that includes an arbitration provision which purports to cover the dispute"). A court may order arbitration of a dispute only where it is satisfied that the parties entered into an agreement to arbitrate it. Granite Rock Co. v. International Brotherhood of Teamsters, 561 U.S. 287, 296 (2010) (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995)). The party seeking to compel arbitration must demonstrate: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [a party] to arbitrate the dispute." American General Life & Accident Insurance Co. v. Wood, 429 F.3d 83, 87 (4th Cir. 2005) (quoting Adkins, 303 F.3d at 500-01). Here,

---

arbitration agreement, the court must first determine whether there was an agreement to arbitrate. 9 U.S.C. § 4; Dillon v. BMO Harris Bank, N.A., 787 F.3d 707, 713 (4th Cir. 2015).

Case 1:21-cv-00515-TDS-JLW   Document 95   Filed 01/23/23   Page 12 of 29

the parties dispute whether their agreement included an arbitration provision.

"Arbitration is 'a matter of consent, not coercion,' and federal arbitration policy does not alter that maxim." Raymond James Financial Services, Inc. v. Cary, 709 F.3d 382, 385 (4th Cir. 2013) (quoting Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 479 (1989)). The Fourth Circuit has recognized that "the 'touchstones of arbitrability analysis' are the 'twin pillars' of the parties' 'consent and intent' to arbitrate." Id. at 385-86 (quoting Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 103 4th Cir. 2012)). While the court must resolve any ambiguity regarding the scope of the arbitral issues in favor of arbitration, Moses H. Cone, 460 U.S. at 24-25; Wachovia Bank National Ass'n v. Schmidt, 445 F.3d 762, 767 (4th Cir. 2006), the question of the parties' intent to enter into an agreement to arbitrate does not enjoy any presumption favoring arbitration, First Options of Chicago, Inc. v. Kaplan, 514 U.S 938, 944 (1995).

To determine whether the parties agreed to arbitrate a particular dispute, the court must consider relevant state law principles governing contract formation. Hill v. Peoplesoft USA, Inc., 412 F.3d 540, 543 (4th Cir. 2005); see Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987). In a case premised upon diversity jurisdiction, such as the present one, a federal court applies the

13

law of the forum state.  <u>Arthur Anderson LLP v. Carlisle</u>, 556 U.S. 624, 630–31 (2009).[10]  Thus, this state's choice of law rules apply. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 495–97 (1941). For a contract claim, North Carolina's choice of law rule is *lex loci contractus* – the law of the place where the contract was formed.  <u>Fortune Ins. Co. v. Owens</u>, 526 S.E.2d 463, 466 (N.C. 2000).  A contract is formed at the "place at which the last act was done by either of the parties essential to a meeting of the minds."  <u>Key Motorsports, Inc. v. Speedvision Network, LLC</u>, 40 F. Supp. 2d 344, 347 (M.D.N.C. 1999) (quoting <u>Fast v. Gulley</u>, 155 S.E.2d 507, 510 (N.C. 1967)).  While presumably that might be either California or Delaware, as the MSA Sales Order reflects it was accepted by Zeltiq (which Plaintiffs represent is a Delaware LLC with a California address (<u>see</u> Doc. 1-1 at 3, 6)) on June 27, 2016 (Doc. 29-3), Defendants do not argue this ground, and none of Defendants' declarations avers where the MSA Sales Order was finally accepted by Zeltiq.  (Doc. 84-1; Doc. 84-2; Doc. 89-1; Doc. 89-2.)  Rather, the parties argue that the law of North Carolina, where the MSA Sales Order was negotiated, applies, and the court need not question that conclusion on this record.[11]

_____

[10] While the proposed arbitration provision states that California law applies, the court's preliminary question of course is whether the provision is even part of the parties' contract.

[11] In any event, there is no showing by the parties that North Carolina law regarding contract formation differs substantively from California

14

*Wiener v. AXA Equitable Life Ins. Co.*, No. 21-2165, 2023 WL 329317, at *3 (4th Cir. Jan. 20, 2023) (holding that choice of law issues may be waived).

In determining if an agreement to arbitrate exists, North Carolina law instructs "the court to examine the language of the contract itself for indications of the parties' intent." *State v. Philip Morris, USA, Inc.*, 618 S.E.2d 219, 225 (N.C. 2005). The parties' intent is determined in light of the "contract as a whole." *Id.* "Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." *Lane v. Scarborough*, 200 S.E.2d 622, 624 (N.C. 1973). When construing contractual terms, a contract's plain language controls. *See DeLoach v. Lorillard Tobacco Co.*, 391 F.3d 551, 558 (4th Cir. 2004) (noting that "as under general principles of contract law, our task is to 'give ordinary words their ordinary meanings.'" (quoting *Internet East, Inc. v. Duro Communications, Inc.*, 553 S.E.2d 84, 87 (N.C. Ct. App. 2001))); *Walton v. City of Raleigh*, 467 S.E.2d 410, 411 (N.C. 1996) ("If the plain language of a contract is clear, the

---

or Delaware law. While Defendants contend that Attachment A is part of their agreement (which states "[t]he laws of the State of California govern this agreement without regard to conflict of law principles"), they do not suggest that California law should apply in deciding whether Attachment A was a part of the contract. (*See* Doc. 85 at 2, 6-7, 11 (noting that "North Carolina law governing contract formation dictates whether a valid arbitration agreement exists").)

intention of the parties is inferred from the words of the contract.").

The standard for deciding a motion to compel arbitration is similar to that applied to a motion for summary judgment. Berkeley, 944 F.3d at 234; Adams v. Citicorp Credit Services, Inc., 93 F. Supp. 3d 441, 445 (M.D.N.C. 2015). A party seeking to compel arbitration bears the initial burden of demonstrating the absence of any genuine dispute of material fact as to the parties' agreement to arbitrate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Dillon v. BMO Harris Bank, N.A., 787 F.3d 707, 713 (4th Cir. 2015). Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate with specific evidence that there is a genuine dispute of material fact requiring trial. Matsushita Electric Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986); see Drews Distributing, Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 352 n.3 (4th Cir. 2001). In determining whether arbitration should be compelled, the court is entitled to consider materials beyond the complaint and its supporting documents. Berkeley, 944 F.3d at 234. If there are unresolved questions of material fact that prevent the court from deciding the arbitrability issue, the court shall hold "an expeditious and summary hearing." Dillon, 787 F.3d at 713 (citing Moses H. Cone, 460 U.S. at 22; 9 U.S.C. § 4.) "If the making of the arbitration agreement . . . be in issue, the court shall

16

proceed summarily to the trial thereof."  (Id. (citing 9 U.S.C.
§ 4).)

### 2. Merits

Defendants contend that that the parties' written agreement
includes an arbitration provision because the signed MSA Sales
Order expressly incorporated Attachment A, which contains an
arbitration provision, by reference.  (Doc. 85 at 12-13.)  As
evidence, Defendants proffer two declarations authenticating the
MSA Sales Order and the purported attachments and stating that Lev
emailed Sinclair and Ballard the MSA and attachments, including
the arbitration provisions, on June 19, 2016, three days before
the parties met in person to sign the MSA Sales Order.  (Doc. 85
at 13; Docs. 84-1 & 84-2.)  Defendants also offer a recent decision
from a California court that granted Zeltiq's motion to compel
arbitration in another case, Ascentium Capital LLC v. Mitchell
Street Dental Group PC, No. 30-2018-01001353-CU-BC-NJC (Cal. Sup.
Ct. Nov. 10, 2022)).  (Doc. 93-1.)  Finally, Defendants contend
that Plaintiffs "should be estopped from denying their agreement
to the full terms of the MSA because they have been performing and
receiving benefits under the MSA for years."  (Doc. 85 at 19.)

Plaintiffs' affidavits state that they were never presented
with the attachments containing any arbitration provision at the
June 22, 2016 meeting and never saw attachments A through C before
signing the one-page MSA Sales Order.  (Docs. 34-1 ¶¶ 16-17; 34-2

17

¶¶ 14-15.)  Plaintiffs contend they had no intention of signing a contract with an arbitration provision.  (Id.)  Plaintiffs also contend that the MSA.pdf file attached to the June 19, 2016 email, which contained (among other provisions) the arbitration agreement, cannot serve as a "valid written agreement" for several reasons, including Defendants' failure to comply with North Carolina's Uniform Electronics Transactions Act ("NCUETA"), N.C. Gen. Stat. § 66-315(e), and the writing requirements of both North Carolina's statute of frauds, N.C. Gen. Stat. § 25-2-201(1), and § 2 of the FAA.  (Doc. 87 at 12-13.)

The court begins with Plaintiffs' argument that consideration of Attachment C is barred by the NCUETA, as this argument is potentially dispositive of Defendants' motion to compel arbitration.  The NCUETA allows for certain transactions to be conducted by electronic means.  It also permits parties to sign documents electronically, and there are certain presumptions about when electronic records are received if sending protocols are observed.  N.C. Gen. Stat. §§ 66-316(b), 66-325.  Plaintiffs note that the act, by its terms, "applies only to transactions between parties each of which has agreed to conduct transactions by electronic means," which is "determined from the context and surrounding circumstances, including the parties conduct."  Id. § 66-315(b).  Plaintiffs argue that the MSA.pdf file attached to the June 19, 2016 email constitutes an "electronic record" within

18

the meaning of the NCUETA (id. at § 66-312(7), and they point out that they never agreed, either implicitly or explicitly, to conduct their transaction by electronic means. (Doc. 87 at 13.) Thus, Plaintiffs contend, their failure to ever agree to conduct the MSA Sales Order transaction electronically prevents Defendants from relying on the MSA.pdf file, an electronic record, as a basis for the contract. (Id. at 15.)

Merely because the MSA.pdf file attached to the June 19, 2016 email is an electronic record within the potential protection of the NCUETA, however, does not mandate that it not be considered here. The actual transaction – the signing of the MSA Sales Order – was conducted in person and not by electronic means, which is the central purpose of the act. The NCUETA does not clearly contemplate that the sending of documents by email prior to an in-person meeting precludes their consideration. Plaintiffs have cited no authority to that effect. The only case law applying the NCUETA is Powell v. City of Newton, 703 S.E.2d 723, 727-28 (N.C. 2010), which expressly rejected the application of the act to a transaction involving the exchange of documents by email where the parties contemplated a physical signature for a land conveyance. This court is bound to follow state law and should not seek to expand it. See Burris Chem., Inc. v. USX Corp., 10 F.3d 243, 247 (4th Cir. 1993) (federal courts adjudicating issues of state law "rule upon state law as it exists and do not surmise or suggest

19

its expansion"). To adopt Plaintiffs' position would exceed the application contemplated by the statute as interpreted by the North Carolina courts.

Plaintiffs' reliance on several cases from other jurisdictions under their various statutes for electronic records transactions to support their contention is unpersuasive. For example, Plaintiffs cite SN4, LLC v. Anchor Bank, 848 N.W.2d 559, 567 (Minn. App. 2014), and Buckles Management LLC v. InvestorDigs, LLC, 728 F. Supp. 2d 1145 (D. Colo. 2010). However, these cases concerned whether an electronic signature validated contracts, not whether attachments could be sent via email before signing documents in person. In Anchor Bank, the trial court found, and the appellate court affirmed, that there was no express or implied agreement to "electronically subscribe to the purported agreement" but rather evidence that one party wanted the contracts executed by hand. 848 N.W.2d at 567. Though plaintiffs sent the bank hand-signed versions of the contract, the bank never hand-signed them. Id. The court rejected plaintiffs' argument that "the bank electronically subscribed to the agreement." Id. at 566. The court was unpersuaded because it concluded that "the [state electronic transactions act] is inapplicable because no reasonable fact-finder could determine that the buyers and the bank agreed to use electronic signatures to subscribe to an e-mail attachment." Id. at 569. Similarly, in Buckles Management, the court determined

20

that as a matter of law, an email signature was not "executed or adopted by a person with the intent to sign the record." 728 F. Supp. 2d at 1151 (citations omitted). Here, in contrast, the parties executed the MSA Sales Order in person, and the issue is whether they intended for the attachments to be incorporated into it, not whether the parties signed the MSA Sales Order.

The court therefore finds that the NCUETA is inapplicable and does not bar consideration of the purported attachments merely because they were sent via email.

In similar fashion, Plaintiffs' argument that the arbitration provision of Attachment A cannot be considered because it is barred by the writing requirements of both the statute of frauds and § 2 of the FAA fails. The arbitration provision is indisputably in writing, and the MSA Sales Order is signed. The question is whether Attachment A is signed by the party to be charged – i.e., by Plaintiffs, and that turns on whether it was properly incorporated by reference into the MSA Sales Order, an issue to which the court now turns.

Defendants' principal argument is that Attachment A is incorporated into the MSA Sales Order by virtue of the express incorporation at the bottom of the MSA Sales Order as well as the fact that a copy of the attachment containing the arbitration provision was sent to Plaintiffs in Lev's June 19, 2016 email. Defendants contend Plaintiff Sinclair is bound by the reference

21

because she signed the MSA Sales Order and had a duty to read it. (Doc. 85 at 14-15.) Plaintiffs respond that North Carolina's duty to read obligation cannot be stretched to benefit Defendants in this case and that no attachment was presented at the June 22, 2016 signing of the MSA Sales Order. (See Doc. 87 at 15-16.)

In North Carolina, a party signing a contract has a duty to read its provisions and will be bound by the terms of what she signs. Mills v. Lynch, 130 S.E.2d 541, 543-544 (N.C. 1963) ("The duty to read an instrument or to have it read before signing it is a positive one, and the failure to do so, in the absence of any mistake, fraud, or oppression, is a circumstance against which no relief may be head, either at law or in equity.") (quoting Furst & Thomas v. Merritt, 130 S.E. 40, 43 (N.C. 1925)). A contract can incorporate other documents by reference such that the incorporated documents become part of the contract, binding the parties. Booker v. Everhart, 240 S.E.2d 360, 363 (N.C. 1978) ("To incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as much as if it were set out at length therein."); Montessori Children's House of Durham v. Blizzard, 781 S.E.2d 511, 514 (N.C. App. 2016) (noting that "[w]hen a contract expressly incorporates a document by reference . . . that document becomes a part of the parties' agreement"). However, in order for a document to be incorporated by reference as a matter of law it,

22

as with any material term of an agreement, must be unambiguous. Lane, 200 S.E.2d at 624.

Here, while Sinclair surely had a duty to read the MSA Sales Order she signed, and while that document stated that the parties' "'Master Sales Agreement' includes this Sales Order and the attachments (A-C) hereto which are incorporated herein in their entirety by this reference," the reference to the attachments is ambiguous. The MSA Sales Order does not specifically identify the location of the attachment containing the arbitration provision. Cf. Krusch v. TAMKO Bldg. Prods., Inc., 34 F. Supp. 3d 584, 589 (M.D.N.C. 2014) (upholding arbitration provision contained in warranty materials whose availability was specifically molded onto each shingle plaintiff purchased). Moreover, Plaintiffs contend, and Defendants do not deny, that Lev did not present the attachments at the June 22 meeting, which would have been easy to do. Given the manner in which Lev proceeded, identification of the attachments referenced depends on parol evidence offered by Defendants - that the attachments are the those attached to Lev's June 19, 2016 email. Martin v. Vance, 514 S.E.2d 306, 311 (N.C. App. 1999) (approving of consideration of extrinsic evidence to interpret ambiguity of contract containing arbitration provision). Yet, Sinclair and Ballard deny ever having read those attachments and claim they were unaware of them at the time Sinclair executed the MSA Sales Order. (Doc. 34-1 ¶¶ 15-16; 34-2 ¶¶ 13-14.) The

23

duty to read does not extend to Lev's June 19, 2016 email, as it was not a document that Plaintiffs executed. Thus, Plaintiffs cannot be held to knowledge of the email's attachments as a matter of law.

The question ultimately is the intent of the parties when they signed the MSA Sales Order. <u>Martin</u>, 514 S.E.2d at 311. Defendants have offered evidence that Plaintiffs must have known of the contents of Attachment A, which included the arbitration provision, and intended that it be incorporated because, among other things: Sinclair and Ballard do not deny having read the June 19, 2016 email; they would not likely have entered into a contract of this magnitude (over $136,000) without having read the terms of the agreement in the attachments; the MSA Sales Order Sinclair signed expressly makes reference to and includes "attachments (A-C) hereto"; Plaintiffs responded to other emails at about the same time as the June 19, 2016 email; and Michael Ballard shortly thereafter inquired about the CoolSculpting System's warranty that was contained in Attachment C in order to save money on financing. Sinclair and Ballard maintain, however, that they never read or were aware of the attachments to the June 19, 2016 email. This is an unequivocal denial, which is supported by their affidavits. <u>Drews</u>, 245 F.3d at 352 n.3 (noting duty of party opposing arbitration to unequivocally deny there was an arbitration agreement and produce evidence to support that

24

denial). As a consequence, the court is not satisfied there is an agreement to arbitrate because this factual dispute must first be resolved by a fact finder. 9 U.S.C. § 4; <u>Berkeley</u>, 944 F.3d at 234 (noting that "the court is obliged to conduct a trial under the Trial Provision [of the FAA] when a party unequivocally denies 'that an arbitration agreement exists,' and 'shows sufficient facts in support' thereof").

Plaintiffs cite several cases to support their argument that Defendants' motion should be denied because Sinclair and Ballard never saw the attachments and thus could not have agreed to arbitrate. However, their cases are distinguishable. Plaintiffs rely most heavily on <u>Sciolino v. TD Waterhouse Investor Services, Incorporated</u>, 562 S.E.2d 64, 66 (N.C. Ct. App. 2002). There, the defendant argued that an arbitration provision was incorporated into the parties' contract because plaintiff's application contained an agreement to "be bound by the terms of the attached Customer Agreement" which contained the arbitration clause. <u>Id.</u> The appeals court affirmed a denial of a motion to arbitrate after the trial court "conducted a plenary hearing" and found that "the existence of an agreement to arbitrate has not been demonstrated." Importantly, the court determined that there was not an agreement to arbitrate as a matter of fact, not as a matter of law. <u>See id.</u> Among the problems was a lack of evidence "to suggest that [the arbitration provision] was ever provided to plaintiffs, when it

was provided . . . or whether plaintiffs ever saw it at all." Id. As the court noted, "Defendants produced no evidence that plaintiffs actually received either customer agreement when they signed the application." Id. at 67. Here, in contrast, Defendants have provided evidence that Plaintiffs received Attachment A before executing the MSA Sales Order.

Similarly, in Dillon, the court denied arbitration after it found the evidence submitted regarding the arbitration agreements was neither reliable nor credible. 173 F. Supp. 3d at 273. The court admonished that "online sellers cannot insert terms and conditions the consumer did not have an opportunity to review." Id. at 269. Here, by contrast, Defendants' evidence is sufficient for a fact finder to believe Plaintiffs must have read the attachments, including the arbitration provision, before executing the MSA Sales Order.

Defendants' reliance on the decision of the California court granting a motion to compel arbitration is also misplaced. While the parties there agreed that they signed the MSA Sales Order and the plaintiff claimed he never received or saw the attachments containing the arbitration provision, that version of the MSA Sales Order included the additional statement that the parties "explicitly acknowledge[] receipt of the Attachments," which the court found persuasive. (Doc. 93-1 at 2-3.) In contrast, the MSA

Sales Order in this case does not contain that explicit acknowledgement of receipt of the attachments.

Finally, Defendants' argument that Plaintiffs are collaterally estopped from denying the arbitration provision is part of their contract is meritless. Defendants' argument relies heavily on Plaintiffs' request to have Zeltiq forward Ascentium a copy of the warranty for the CoolSculpting System to permit Plaintiffs to avoid an insurance premium as well as Plaintiffs' use of the equipment after the June 2016 sale. (Doc. 85 at 19-20.) More specifically, Defendants contend that because Plaintiffs "invoked the additional terms of MSA Attachments A-C," Plaintiffs should be estopped from denying the arbitration provision. (Doc. 89 at 6-7.) Defendants rely on this court's decision in Krusch, supra. But the facts here fall short of those in that case. In Krush, this court enforced an arbitration provision contained in a limited warranty because before purchase the plaintiff's agent had received a sample roofing shingle that contained an embossed notice advising of the limited warranty and listing a toll-free telephone number and website address for a copy of the materials. 34 F. Supp. 3d at 589-90. Thus, the evidence demonstrated that the plaintiff's agent had actual notice of the materials. Whether Plaintiffs here had notice, by contrast, remains a fact issue. While there is an inference (perhaps even a strong one) that Plaintiffs may have only learned of the warranty

27

in the email attachments, it is not apparent that is the only source of their knowledge. Indeed, had Plaintiffs known of the warranty in Attachment C, they ostensibly would not have had to ask Zeltiq for a copy. Moreover, while the Krusch plaintiff was aware of the warranty before purchase and chose not to read it, there is a fact question here whether Plaintiffs were even aware of Attachment A containing the arbitration provision (or Attachment C's warranty for that matter) before purchase. And unlike the situation in Krusch, where the plaintiff was seeking to enforce the very warranty that contained the arbitration provision he claimed was not agreed to, here the Plaintiffs do not seek to enforce the warranty provision contained in Attachment C, which is also a different document from Attachment A that contained the arbitration provision. (Doc. 84-1 at 7-9.)

Because a review of the complete record demonstrates that Defendants have not established an agreement to arbitrate as a matter of law in that there is an issue of fact as to whether the Plaintiffs intended for Attachment A, which includes the arbitration provision, to be part of their contract, and because Plaintiffs have made a jury demand, Defendants' motion to compel arbitration must be resolved by that factfinder. Berkeley, 944 F.3d at 241-42.

## III. CONCLUSION

For the reasons stated,

28

IT IS THEREFORE ORDERED that Plaintiffs' motion to strike evidence in Defendants' reply brief (Doc. 90) is DENIED;

IT IS FURTHER ORDERED that Defendants' second motion to compel arbitration and stay proceedings (Doc. 84) shall be set for determination by jury on March 6, 2023, at 9:00 a.m.

/s/   Thomas D. Schroeder
United States District Judge

January 23, 2023